The next case is the Douglas Stewart Company, Incorporated v. HIQ Solutions, Incorporated. Jessica Polakowski is here for the appellate Douglas Stewart. Jonathan Goins is here for HIQ Solutions. And once you're all ready and situated there, Ms. Polakowski, you may begin your argument. Okay. Good morning, Your Honors. Before I begin with my argument, I'd just like to confirm that it's acceptable that I argue sitting, given my hearing. Thank you, I appreciate that. May it please the Court, my name is Jess Polakowski, and I'm here today representing Douglas Stewart Company. This is a fairly straightforward case. It's a contract dispute between my client, Douglas Stewart, and a website developer, HIQO. Douglas Stewart hired HIQO to provide it with coding and software development services to create an improved website. The contract required that the website indeed any deliverable with a capital D that HIQO provided comply with both industry standards and specifications with a capital S. But according to HIQO, not only did it need not provide a website that was up to industry standards or specifications, it didn't need to provide any deliverable at all. So long as it was nominally providing services, it was living up to its end of the contract and could do so, according to HIQO, in perpetuity on Douglas Stewart's dime without breaching the party's agreement. At the time Douglas Stewart made the decision to go live with the website provided by HIQO, it did so based on the website as it existed in the testing environment. Douglas Stewart later learned that not only did the core functions of the website at go live not function, but HIQO had actually hard-coded certain functionality like SKU linking into the testing environment to trick Douglas Stewart into thinking that the website was indeed functioning when it was not. Well, let me ask you this question so we can get to the heart of the matter in this case. There are expressed disclaimers in the Master Services Agreement relating to timeliness and quality. Why would you even have a disclaimer, a waiver, if it isn't going to be enforced? Your Honor, it's our position that the court's interpretation of the disclaimer essentially eviscerated the core essence of the contract, which the court cannot do under Georgia law. Specifically, and I'll address each of the disclaimers in turn, Section 8, first and foremost, does not obviate HIQO's obligations to provide all deliverables in accordance and compliance with the specifications and industry standards, as required explicitly by Section 2.2A of the contract. Section 8 provides that despite thorough testing, bugs may occur. Douglas Stewart agrees with the district court's initial interpretation of this provision that HIQO disclaimed any responsibility to provide a website without flaws. Our agreement ends, however, where the district court equated a flawless website with a functional one. Can I ask you, you referred to deliverables. What are deliverables? Thank you. Where can we find the answer to what they are? Deliverables is defined in the contract at Section 1.2 as the documents, code, content, software, websites, and other materials and or products to be developed or produced by HIQO and on behalf of the company and or company customers or clients. So it's everything from a line of code to the fully functional website? That's exactly right, and HIQO's CEO testified that deliverables included anything that HIQO provided to Douglas Stewart. What is the obligation? So I've looked at this contract a couple of times, and I am confused about where the obligation is to provide a deliverable. I look at 2.1, and it talks about the obligation to perform task orders. What is the, where is the obligation here to do something that's not in a task order? Sure, so Section 2.1 defines the services to be provided under the agreement and defines it as more particularly described in any task order or as otherwise agreed to by the parties as evidence or confirmed in writing. And then it speaks in terms of the development services to be provided. It's our position that, and deliverables is, again, defined in the contract. It's our position that HIQO did deliver deliverables. Yeah, but where's the obligation to deliver the deliverables? It would be in Section 2.1. The services result in deliverables, and if deliverables are, in fact, provided, they are to comply with industry standards and specifications. Okay, I'm sorry. I just, I'm looking at it right now. Where exactly does it say? I see we'll provide software development services under a task order where there's project scope is fixed. That's 2.1A, 2.1 itself. Okay, described in any task order or as otherwise agreed to by the parties. I guess that's what I'm trying to figure out. So otherwise, so you're saying otherwise agreed to by the parties is just in this agreement where it defines a term? It's actually in Section 2.1 that indicates the services to be provided, and then also Section 2.2A defines the deliverables to be provided. And where does it say that they're going to provide something with respect to deliverables? I mean, this is a very confusing contract, I guess. Just walk me through. So we've got a definition of deliverables, and then you say that there's a requirement that they meet industry standards. Where does it say, hey, referring to that definition of deliverables, we're going to do that? So Section, and first of all, let me just say I agree with you that the contract is a bit confusing, and to the extent that there is any ambiguity, there is no dispute that this contract is written by HICO, and any ambiguity must be construed against HICO as a result. So Section 2.1 defines the services to be provided, and then Section 2.2A defines deliverables and states specifically that all deliverables will, and it's capital D as the defined version of deliverables, will be developed and delivered to company or its clients in accordance and compliance with the specifications, industry standards, and all applicable laws, rules, and regulations. And so while I take Your Honor's point that it does not state that deliverables must be provided, Section 2.2A does infer, and again, all inferences must be taken in favor of Douglas Stewart at this stage, that deliverables to the extent that they are provided, which there's no dispute that they were provided here, must be provided in accordance with the specifications and industry standards. Well, I certainly understand this is HYCU's contract, but your client signed the contract and entered into the contract, and your client could have included language setting specific target dates and excluding waiver of liability for failure to adequately debug prior to a deliverable, but it didn't. Your Honor, I appreciate that. Bound by the contract that you entered into. There is no question. We are bound by the contract that we entered into, and it's our position that the contract we entered into required the provision of deliverables in accordance with specifications and industry standards. The core essence of this contract was for a functioning website. There's no dispute that the website that was provided did not comply with industry standards and specifications. Let me ask you this. Let's assume that all you had was this contract and there were never any task orders. What would have happened? Well, according to the district court, the district court actually did rule that in order to interpret specifications, you need to look outside of the master services agreement. Right. And the court indicated that you must look to the communications of the parties, which in our view incorporated what we refer to as the swarming proposal and the quotation. So we do need to look outside of the contract to determine what constitutes specifications, what the parties contemplated being provided in accordance with this agreement. I thought there was a merger clause. Section 23 had a merger clause that limits your agreement to the master services agreement. Your Honor, you are correct that the contract does have a merger clause, but the district court looked beyond that merger clause to say that,  the project goals and expectations were intended to include matters outside of the scope of the MSA and told otherwise would be inconsistent with the language of the agreement, according to the district court. And so it's our position that in order to be consistent with the language of the agreement, you have to consider the specifications as they were intended by the parties looking to the communications between the parties, which, again, the court ruled it must do. Answer this for me. Why isn't the right way to read this agreement that it sets up a structure for the purpose of issuing task orders? And if you're going to sue for breach, you would need to point to a task order that wasn't performed according to the task order. Well, Your Honor, the language of the contract is not limited just to task orders. It indicates that it may be any provision that is evidenced in writing or confirmed. Okay, well, I mean, okay, whatever you want to call it, not a task order or an email. I mean, I don't care. You know, if you want to just incorporate any writings, why isn't that the right way to read it, that you have to look at just some other writing and say, like, you're breaching this other writing. You agreed an email to provide a consultant for 20 hours at this rate, and you didn't do it. That is our position, that HICO agreed to provide a website consistent with the specifications. And where's the order? Where's, like, the email or the task order where they said we hereby agree to provide a website? The evidence in the record is numerous. First of all, there is a quotation that HICO provided that outlined the requirements to be provided, including a website with things like improved SKU linking, improved shopping cart functionality, certainly credit card capabilities and the like. Didn't that quotation, though, predate the actual contract? And then you run into the merger clause. Yes, that is true. But again, as a district court held, you must look to evidence outside of the MSA. That same quotation and the swarming proposal, which formed the basis of that, was subsequently incorporated in HICO's document management system called Confluence and was referred to as a requirements document. And it's our position that certainly something that the parties referred to as requirements for the contract can be interpreted by a reasonable jury as specifications. And I would just remind the court that specifications is also defined in the contract as all design and capability requirements of the website. So it's our position that the design and capability requirements must include things like the requirements that everybody understood in writing that HICO itself referenced in its own system as the requirements. Certainly that was incorporated in the parties' intention in the contract. What do you say to the argument that you prematurely canceled the contract? Your Honor, with regard to that argument, it's our position that the district court erred in finding that work was still ongoing. It's our position that this contract is indefinite as to time. And as a result, Georgia law, Georgia statutes specifically imply a reasonable period of time. It's our position that the period of time from entry of the contract in November of 2016 and our termination of the contract in July of 2018, nearly two years later, was more than a sufficient period of time, more than a reasonable period of time, that a jury could find constituted a breach for failure to provide performance within a reasonable time. Did any of the task orders identify an agreed upon or stipulated target date? No, Your Honor. It is undisputed that there are no target dates that were set by this contract. The evidence in the records does show that the parties contemplated or discussed a period of four to six months for project completion. It's not our contention that HICO breached for failing to deliver that website within four to six months. It's our contention that, given that record evidence, a reasonable jury could find that two years to deliver a non-functioning website is not a reasonable time for performance and constitutes a breach. With the, I'm thinking of the Car Dime case right now, but wouldn't it be possible for HICO to perform within industry standards but not by a certain date, not within two years? Certainly. I don't believe that the Car Dime case spoke to, and I apologize if I'm saying that wrong, but it spoke to time, but it certainly did speak to disclaimer of warranty. And in that case, it was a professional and workmanlike manner. And the parties had specifically carved out from that the patient matching requirement. And the Car Dime specifically disclaimed any warranty related to patient matching. It specifically said in the contract, we do not warrant any accuracy with regard to patient matching. Similarly, here is our position that HICO could have carved out of industry standards something, say, SKU linking. For instance, if the contract here said HICO does not warrant that SKU linking would be functional, Douglas Stewart couldn't come back later and say you breached the contract for failing to provide functioning SKU linking. That is essentially the very essence of the contract. In the hypothetical disclaimer that I just provided, the very thing that forms the breach of the agreement is the thing that is carved out from the warranty. Well, the district court looked at our precedent for guidance and found the reasoning in Car Dime versus Pruitt Health to be instructive. The facts seem to be pretty similar to this case. I mean, just like there, we've got disclaimer provisions in the contract, divesting the software company of liability for failing to deliver a certain level of patient matching. It seems to be a pretty similar case. Your Honor, respectfully, I believe that case is inapposite because of the distinction I just mentioned, which is in that case, Car Dime specifically carved out patient matching. There is no such carve-out here for industry standards. Again, we don't dispute that HICO could have carved out some industry standard provision, for instance, SKU linking or credit card acceptance. We could not then use that as the basis for a breach of contract claim. In Car Dime, there was no inconsistency between the warranty to perform in a professional and workmanlike manner and the disclaimer of some particular but undefined level of accuracy in patient matching. Here, Section 2.2A of the contract expressly warrants compliance with industry standards, including functionality, and that warranty is again reaffirmed in the contract at Section 11.1. But then it expressly disclaims by a certain time and without bugs. The disclaimer is, well, Section 8 is despite thorough testing, bugs may occur, which we do not dispute. Again, the dispute is whether functionality and flawlessness are equivalent, and it's our position that they are not. At the very least, that is an issue of fact that the jury should determine. And with regard to the timeliness issue, it simply says, the disclaimer essentially says, delays may occur. And it's our position that, again, delays may occur, leave the contract indefinite as to time, which according to Georgia law then, a reasonable time must be implied for performance. All right. Thank you, Ms. Polakowski. Mr. Goins, you may present your argument. May it please the Court. I want to address some of the comments made just now. Judge Wilson, I think you said, you know, the client signed the contract. That's exactly right. There is one contract in this case. It's the MSA, the Master of Services Agreement, that no dispute here. It's unambiguous that both parties signed one contract. It's also not in dispute that the parties, in terms of the deliverables, as Judge Brasher asked, are to be more particularized based upon task orders. No different than a statement of work when you're dealing with software like this. Well, what, in your view, was HICO expected to do exactly under the terms of the contract? Yes, they were obligated to provide software services and resources. This was a typical time and materials contract. And I direct your attention to Section 2, and more particularly, there are four different types of options that are applicable to someone who wanted HICO services.  That's the project task order as well as the team task model. And that's 2.1A and 2.1C. So, there are a total of 19 task orders that HICO and Douglas Seward signed. They both signed them. So, in addition to the MSA, the parties then continue to do work more particularized based upon the task orders. The very first task order, for instance, from December of 2016, it states that HICO is to task entering JIRA. Well, that's source code. So, this is a time and materials contract in which a website developer or software developer was providing software services and resources of time to Douglas Seward. So, is it your position that HICO never contracted to provide a fully functional website? That is exactly right. And Judge Moore properly found that there was no evidence to support that HICO was obligated to provide a fully functioning website. In addition to the task orders, are there other writings that detail what HICO was doing or was expected to do? I'm just making a distinction between the task orders and other writings that the contract seems to contemplate. Correct. So, there are no other writings in which both parties mutually agreed to what was to be performed. There are certainly subsequent communications and emails, various emails. There's over 63 pages of documents exchanged between the parties. Over six witnesses were deposed. There's certainly subsequent communications about the ongoing progress of HICO's work for Douglas Seward. Questions about timeliness. There are questions about issues that were transpiring. Douglas Seward itself, one of its own employees, actually broke the website twice. Once in May of 2018 before they decided to go live with Commenge 2.0. And then once again in July of 2018, just a month later. So, this is a situation where both parties had equal access to a source code repository leading up to the website launching, which was done by Douglas Seward, by the way. So, this is a very important distinction here. This is not a situation where we're dealing with a software website developer that controlled the source code, that actually engaged in trying to launch a brand new website. And then at the end of their work product, they then released the source code keys to the client or customer. That was not this contract, and that was not the situation. Douglas Seward continues to take this belief without any proof that somehow HICO was going to deliver a good, specifically a website. And that's not what they were doing. They were delivering time and resources. And even in the very first line of what Douglas Seward chose to do, 2.1A, Project T&M, HICO will provide software development services under a task order. 2.1C, HICO will provide software development resources, i.e. staff, under a task order. So, indefinitely, I mean, indefinitely, I mean, why isn't the court bound by the Georgia law that says a court should construe a contract that's requiring performance within a reasonable time? I totally agree with you, Judge Wilson. And despite the fact that HICO disclaimed explicitly a specific targeted date, they remained willing and open to continue to work on the project. It was Douglas Seward, not HICO, that chose to terminate this agreement rather abruptly, by the way. They didn't comply with the notice obligation, by the way. They were supposed to give advance notice prior to terminating. They didn't do that. They just simply terminated HICO effective immediately, cut off their access effective immediately of July 31st of 2018. So, the problem with that question is, how can you really apply that when you don't have any evidence supporting that the software developer was somehow going to no longer engage in providing any work? HICO never said, we're going to stop doing work here for you, or we're going to stop providing you with resources or efforts to help you with your website. Let me ask a fact question about the timing issue. Do the task orders have time limits on them? The task orders do include, like, the number of hours that are to be estimated by particular software engineers. There are well over seven of them that HICO provided, each of whom have a bachelor's degrees, many of whom have technical master's degrees. But no, they do not give any specificity about a particular date. And there is a modification clause, as we know, in the MSA. And so, if you want to penalize HICO for the fact that it should have produced or provided its work product by a particular date, then the parties should have made that modification, should have been mutually assented to. And both parties signed the task orders, each and every one of them, 19. So, from our viewpoint, timeliness is problematic, not for HICO, but also for Douglas Stewart. This is another distinguishing fact that you want to be mindful of. For whatever reason, Douglas Stewart chose to not have HICO work on their website for five months. From September of 2017 through January of 2018, HICO did nothing. Not because they didn't want to, but because Douglas Stewart didn't ask them to. That's an undisputed fact in the record. So, if timeliness is so important, why would you not have the developer assist you and provide work for five whole months? That's a huge gap, and it's not necessarily making any sense. If I decide I want to do some upgrades to my house, I want to hire a contractor to help me with those upgrades. I'm going to pay particular attention to the contract. I'm going to focus on what the contract says. It's the obligation of the contractor to actually not just provide me with time and resources and materials of enhancements that I need for upgrading my website or upgrading my house, but whether or not they are the ones who are obligated to actually make the upgrades of the house in and of itself. Let me ask you this. What would a breach of a task order look like? So, this is a question that the 11th Circuit's paradigm case assessed, which is, what is the distinction between a disclaimer and perfection? The way that the paradigm balanced this ebb and flow is to say that, well, a party can still engage in a professional and worksmanlike manner without promising perfection. And in the paradigm case, which was a joint venture between Microsoft and GE Health, they offered and promised to perform services and assisting Pruitt Health with their website, but they did not promise that the patient matching data would be accurate. So, it is dealing with quality control. And the court found that paradigm was permitted to disclaim, and the language of their disclaimer is very similar to the language of the MSA disclaimer in this case. They were allowed to disclaim perfection while still providing professional worksmanlike support. Well, what I'm getting at is, this is a time and materials contract, you say, and if a task order commits so much time and so much materials, is that the extent of what HICO is obligated to do? Does it have to accomplish anything with that time and materials? Well, they certainly want to be able to provide source code and other deliverables that can assist with overall, you know, the spirit and the content of the MSA and wanting to assist HICO, excuse me, assist Douglas Stewart in being able to successfully migrate from Magento 1 to Magento 2. Could it be a violation of industry standards to not accomplish the task in the work order? Well, you would have to outline what specifically that they did that breached a particular standard. For example, there's the IEEE, which is the Institute for, let me make sure I get this right, the Institute for Electrical and Electronic Engineers. It's a nonprofit standard organization based in New York that comprises of over half a million members throughout 190 countries. They're responsible to having published about one third of the world's literature with respect to computer software and engineering. There were experts on both sides of the case, and so this was extensively litigated. So our particular expert, for example, Dr. Chuck Easton, his position was in order to truly determine if HICO engaged in a particular breach of a particular standard, industry standard, you must do line-by-line comparison. And so he, in excruciating detail in his report, which are included in Volume 2 of our supplemental appendix, he went line-by-line and gave examples of regression testing, other particular diagram, other examples of source code that HICO completed for Douglas Stewart, in other words. He then compared that source code to what the standard should be by IEEE, by SWEBAC, by NICOLSE, other well-respected, well-known industry standard setting organizations. And he even found that in one instance, HICO actually used the same template that other publishers have often used by computer engineers in terms of source code templates. So if there is a standard industry that somehow HICO breached, that was not proven in this case by Douglas Stewart. And that takes me, I did want to address this real quick. So Douglas Stewart stated that the issues before this court are two-fold. Did the district court err in holding as a matter of law that HICO had no obligation to complete his work on the part of MSA? That's not what Judge Moore held. He didn't say that HICO had no obligation to complete his work. He just said that they did not prove that HICO engaged in a breach, particularly when it came to timeliness or accuracy or perfectionism. They also state that the second issue before you is, did the district court err in failing to apply the proper summary judgment standard in resolving HICO's motion for summary judgment? That, too, is a bit misguided. The district court didn't err in failing to apply the proper summary judgment standard. Judge Moore was very thorough. He spent over three pages in stating what the standard was. So he didn't apply an improper standard for summary judgment. We all know that if there is barely any evidence that is supporting one's claim, then the burden shifts to the non-moving party to prove otherwise. So he basically found that, look, the burden shifts to Douglas Stewart to then prove that there was evidence of a breach. And he went through excruciating detail in a 36-page opinion, often citing two various deposition transcripts, even pointing out particular emails that were exchanged between the parties. And he ultimately found that there was no genuine issue of material fact that should support why this case should go to or beyond summary judgment. I hesitate to say that this would go to a jury because there is a waiver of jury provision in the MSA as well. So I'm not even sure that this would even go before a jury, especially since both parties agree that we're not dealing with contractual terminology that is ambiguous. Both parties agree that the contract is unambiguous. And on page 37 of Appellant's own brief, they acknowledge that Section 7 and Section 8 are both unambiguous. So with that, I rise. All right. Thank you, Mr. Goins. Ms. Polakowski, you've reserved some time for rebuttal. Thank you, Your Honor. Very briefly, accepting HICO at its argument, this is essentially a contract that cannot be breached by HICO, so long as it is providing a warm body that is providing services. That is not what the law requires, and that is not what this contract requires. Accurate abstracts is on point. That also was a time and materials contract to build a website. In that case, it was a New Jersey case, but the New Jersey court held that, like Georgia, there's a reasonable time requirement that is implied in New Jersey law. There, the court held that what constitutes a reasonable time for performance under New Jersey law is an implication of fact and not of law. And that precluded summary judgment as a matter of law. Well, let me ask you this now. If there are genuine issues of material fact, how do you get a jury trial if you waived your right to a jury trial in the Master Services Agreement? Your Honor, that is an issue that has not been decided by the district court whether or not we are entitled to a jury trial. Both parties in this case have agreed. What does the MSA say? There is a waiver in the MSA. However, both parties actually requested a jury trial in this case. So I suspect that is an issue that would have to be determined by the district court. All right. And if I could just conclude, a quote from Accurate Abstracts is on point. And the court in that case held that the parties necessarily entered into the agreement with the mutual expectation that the project would be completed within some reasonable period of time short of eternity at some cost short of the GNP. Accurate would not reasonably agree to be strung along forever. A prisoner of its sunk costs would not reasonably expect to be paid indefinitely while producing nothing usable. A reasonable outside time limit must or at the very least could be implied by a finder of facts. Likewise, Douglas Stewart did not agree to be strung along forever, a prisoner of its sunk costs. Thank you, Your Honor. All right. I think we have your argument. Thank you, counsel.